**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. 4:25-cv-446 |
| v. | |
| KENNETH W. ALEXANDER II, ROBERT D. WELSH, and CAEDRYNN E. CONNER, | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") files this Complaint against Defendants Kenneth W. Alexander II ("Alexander"), Robert D. Welsh ("Welsh"), and Caedrynn E. Conner ("Conner") (collectively, "Defendants"), and alleges as follows:

## SUMMARY

1.      Between May 2021 and February 2024, Alexander and Welsh orchestrated a Ponzi scheme, with Conner's substantial assistance and participation, that raised at least $91 million from more than 200 investors in an unregistered securities offering. Alexander and Welsh operated the scheme, which they called the Vanguard JV Cash Program, through Vanguard Holdings Group Irrevocable Trust ("VHG"), a Texas common law trust controlled by Alexander.

2.      Alexander and Welsh promoted VHG as a highly-profitable international bond trading business that held billions in assets. And they represented to investors that VHG or its affiliates would use investor funds to trade, or engage in other dealmaking, in the international bond markets. Alexander and Welsh told investors that investments in VHG would have a 14-month term, and falsely represented that investors would receive 12 *guaranteed* monthly

payments of between 3% to 6% *per month*, with the principal to be returned at the end of the 14-month term. In truth, VHG used investor funds—not profits from bond trading—to make these payments.

3.      As part of their scheme, Alexander and Welsh offered investors the option, for an additional fee, to protect their investments from risk of loss through purported financial instruments that Alexander and Welsh called "pay orders." Investors who purchased the pay orders were required to enter into "pooling agreements" with other investors and a purported fiduciary (the "Fiduciary"). The Fiduciary was owned and controlled by a longtime associate of Alexander and Welsh, and this associate acted at Alexander and Welsh's direction at all relevant times. Pursuant to the pooling agreements, in the event VHG failed to make the guaranteed monthly payments, the Fiduciary was responsible for "liquidating" the pay order and distributing the proceeds to investors. However, the purported protection offered by the pay orders and the Fiduciary was illusory. VHG's bank records do not reflect the purchase of any pay orders and the Fiduciary never attempted to liquidate them.

4.      In July 2022, Alexander and Welsh authorized Conner, who was an early VHG investor and promoter, to create an investment program to pool funds to invest in the Vanguard JV Cash Program. Conner operated this program (hereinafter, the "Benchmark JV Cash Program") through Benchmark Capital Holdings Irrevocable Trust ("Benchmark"), a Texas common law trust that he controlled. The Benchmark JV Cash Program was structured like the Vanguard JV Cash Program, including the pay order protection feature, except Benchmark generally promised *even higher guaranteed* monthly returns. Conner represented to Benchmark investors that their funds would be pooled to invest in VHG, and that the returns Benchmark received from VHG would fund the guaranteed monthly returns paid to Benchmark investors. Through Benchmark, Conner raised approximately $54.9 million from investors, more than $46

million of which he funneled to VHG. The Fiduciary also served as the purported fiduciary for Benchmark investors who purchased pay orders.

5.      Throughout the course of the Ponzi scheme, VHG had no material sources of revenue. During that time, Alexander misappropriated millions of dollars of investor funds for his personal use and Welsh received more than a million dollars of investor funds. Alexander and Welsh also misused investor funds by using them to make Ponzi payments to Vanguard JV Cash Program investors—i.e., using funds from earlier investors to make monthly payments to later investors—and to pay victims of another apparent scheme that they started before, and then operated in parallel with, the VHG Ponzi scheme. For his part, Conner misappropriated millions of dollars of Benchmark investor funds.

6.      In or around February 2023, the VHG and Benchmark schemes began to collapse when VHG and Benchmark ceased paying the purported guaranteed monthly returns to nearly all investors. Throughout 2023, Alexander and Welsh made, and directed the Fiduciary to make, false excuses (such as blaming banks and attorneys) for VHG's failure to make the monthly payments. Conner repeated, and directed others to repeat, many of the same false statements to Benchmark investors. These statements had the effect of prolonging the Ponzi scheme because Welsh, Alexander, and Conner continued to solicit new investments and to encourage existing investors to roll over their principal to new 14-month terms, rather than withdraw their funds as their investment terms expired. Ultimately, the VHG and Benchmark schemes resulted in tens of millions of dollars of investor losses.

7.      By engaging in the conduct alleged herein, Alexander and Welsh violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.      By engaging in the conduct alleged herein, Conner violated Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c)], and aided and abetted Alexander's and Welsh's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9.      As to all Defendants, the SEC seeks permanent injunctions, disgorgement plus prejudgment interest, and civil penalties.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this action under Sections 20(b), 20(d), and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa]. Defendants directly or indirectly made use of means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged herein.

11.      Venue in this district is proper under Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within this district and one or more Defendants reside within this district.

## DEFENDANTS

12.      Alexander was a resident of Fort Worth, Texas, when he created and operated the Vanguard JV Cash Program scheme. Alexander is VHG's trustee and control person.

13.      Welsh is a resident of Frisco, Texas. Together with Alexander, Welsh created and operated the Vanguard JV Cash Program. From January 2012 through September 2019, Welsh

was associated with a registered broker-dealer and investment adviser and held securities licenses. During the investigation that preceded the filing of this lawsuit, Welsh invoked his Fifth Amendment privilege against self-incrimination.

14.     Conner is a resident of Heath, Texas. Conner is Benchmark's trustee and control person. During the investigation that preceded the filing of this lawsuit, Conner invoked his Fifth Amendment privilege against self-incrimination.

## RELEVANT ENTITIES

15.     VHG is a Texas common law trust controlled by Alexander as its trustee.

16.     Benchmark is a Texas common law trust controlled by Conner as its trustee.

17.     The Fiduciary was a Texas limited liability company headquartered in Austin, Texas, controlled by a longtime associate of Alexander and Welsh as its managing member.

18.     Axiom Financial, LLC was a Wyoming limited liability company headquartered in Sheridan, Wyoming, and, separately, a Texas limited liability company headquartered in Frisco, Texas (collectively, "Axiom"). Both entities were controlled by Alexander.

19.     TC Advantage Trader Ltd. ("TC Advantage") is a Bahamian limited partnership headquartered in Houston, Texas, and Grand Bahama. Welsh is TC Advantage's CFO and director.

## FACTS

### Alexander and Welsh's Prior Scheme

20.      Around 2019, Alexander and Welsh, through Axiom and other entities they controlled, began operating a different scheme (the "Loan Scheme") that bore indicia of an advance fee scheme. Advance fee schemes require victims to pay fees up front, prior to receiving any benefit, for a deal to go through from which the victim stands to receive money or some other benefit. In the Loan Scheme, Alexander and Welsh posed as lenders who agreed to lend

businesses millions of dollars under lines of credit in exchange for upfront fees to be paid by the businesses, representing that the upfront fees would be used to prepay interest on the borrowed funds. Alexander and Welsh collected the upfront fees, but then failed to fully fund any of the loans under the lines of credit, and only partially funded some of the loans.

21.    Victims of the Loan Scheme paid advance fees that ranged from $500,000 to $10 million. Some victims were given the option to purchase a pay order purportedly issued by a European bank for an additional 5% fee. The pay order, which Alexander was responsible for obtaining, supposedly protected the borrower from risking the loss of its upfront payment in the Loan Scheme if the lender failed to fund the line of credit. Axiom and the other purported lenders controlled by Alexander and Welsh claimed to be backed by an unidentified "private trust" (VHG) that was responsible for providing capital to fund the lines of credit. Alexander and Welsh represented to the Loan Scheme victims that the private trust's source of capital was profitable international bond trading. They promised to fund the lines of credit over time in multiple tranches, with the first tranche usually due within 30 to 60 days of entering into the line of credit agreement. In most instances, the victims paid the lender the upfront payments (and, if applicable, the pay order fees), but Alexander and Welsh never funded the lines of credit and refused to return the upfront payments (and, if applicable, release the pay orders).

22.    By April 2021, at least five victims of the Loan Scheme had filed lawsuits against Alexander, Welsh, Axiom, and others alleging fraud and misappropriation. As alleged further below, Alexander, Welsh, and Axiom settled some of these lawsuits using Vanguard JV Cash Program investors' funds. Following these lawsuits, Alexander and Welsh continued to operate the Loan Scheme using entities other than Axiom to pose as lenders.

**With the Loan Scheme Faltering, Alexander and Welsh Expanded into Securities Fraud**

23.    In May 2021, Alexander and Welsh launched the Vanguard JV Cash Program. As shown below, the Vanguard JV Cash Program offered investors 12 guaranteed monthly payments of between 3% and 6%, depending on the amount invested, over the course of a 14-month investment term:

| Guaranteed Monthly Return | Investment |
| --- | --- |
| 3% | $30,000 - $999,999 |
| 4% | $1 million - $4.99 million |
| 6% | $5 million + |

According to Alexander and Welsh, and as memorialized in joint venture agreements entered into between VHG and each investor, at the conclusion of the 14-month term, investors would receive the return of all of their principal.

24.    As with the Loan Scheme, Alexander and Welsh offered investors in the Vanguard JV Cash Program the option to purchase pay orders, again purportedly issued by European banks, for 5% of the amount invested. Alexander and Welsh told investors that the pay orders protected investors from the risk of loss of their investment principal and entitled investors to have the value of their investment distributed to them by the Fiduciary if VHG failed to pay their guaranteed monthly returns. According to Alexander and Welsh, the pay orders were financial instruments that, upon tender to the issuing bank, entitled the Fiduciary to payment in cash sufficient to cover 100% of the principal of all investors participating in the pay order. VHG required all investors that purchased a pay order to enter into a pooling agreement with other VHG investors (who remained anonymous to each other) and the Fiduciary. The Fiduciary, which was controlled by Alexander and Welsh's longtime associate, was responsible for, among other things, initiating investors' termination processes upon VHG's default, liquidating pay

orders (which were made out to the Fiduciary), and distributing the pay order proceeds among the investors who were parties to the pooling agreement.

25.    Alexander and Welsh operated the Vanguard JV Cash Program as a Ponzi scheme. VHG's bank records demonstrate that VHG did not trade bonds or notes and, excluding investor funds, reflect minimal deposits. Between May 2021 and February 2024, approximately 95% of the funds deposited into the bank accounts of VHG and its affiliated entities, all of which Alexander controlled, were funds received from VHG or Benchmark investors (approximately 74%) and Loan Scheme victims (approximately 21%). Additionally, Alexander used investor funds to: (1) fund ventures unrelated to VHG's purported trading business; (2) make Ponzi payments to investors; (3) pay Loan Scheme victims (through lawsuit settlements and other payments); (4) pay commissions to promoters, many of whom were VHG investors, for referring investors to the Vanguard JV Cash Program; (5) fund Alexander's personal expenses, including paying for real estate, vehicles, travel, and jewelry; and (6) pay Welsh approximately $1.1 million for commissions and other similar purposes.

26.    Alexander and Welsh marketed the Vanguard JV Cash Program primarily through virtual and in-person presentations and telephone calls. They also used a network of promoters, many of whom were also investors in the Vanguard JV Cash Program, to solicit investors, and paid these promoters commissions for bringing in new investors. As alleged in further detail below, during these calls and presentations, as well as in certain written materials, Alexander and Welsh made false and misleading statements to prospective investors regarding several topics important to their investment decisions, including: (1) the "guaranteed" nature of the promised returns; (2) VHG's business and the activities that enabled it to pay investors the purported returns; (3) VHG's use of investor funds; and (4) the purported protection offered by the pay orders and the Fiduciary.

*Statements Regarding "Guaranteed" Returns*

27.     The joint venture agreement between VHG and each investor contained a recital stating that the investor agreed to invest the principal "in exchange for a contractually guaranteed payment." Alexander signed each of these agreements on behalf of VHG as its trustee.

28.     On or around December 13, 2021, Alexander spoke on the phone with a prospective investor to induce the investor to invest in the Vanguard JV Cash Program. Alexander represented that VHG provided investors with returns of "36 to 72 percent a year."

29.     On or around May 13, 2022, Alexander spoke on the phone with a prospective investor to induce the investor to invest in the Vanguard JV Cash Program. Alexander once again touted the monthly liquidity of the investment program, stating:

> But the numbers change according to what you bring, so we created tiers, you know? And $30,000 being the minimum, and at every—there's intervals at the amount, you know, that you receive monthly will go up. We also wanted to make sure that it provided liquidity because, you know, you've seen programs where money is sitting, and you can't touch it for a year, and you have to wait and wait and wait. There are some individuals who have discretionary income, but they're not completely safe if they're not liquid, right? So—I mean, their lifestyles are not secure if they're not somewhat liquid, right? So, by paying every month, you get a decent, you know, drop of liquidity every month.

Alexander recorded the May 13, 2022 call and shared the recording with Conner, who was also on the call.

30.     On or around September 22, 2022, during a Zoom call with a prospective Benchmark investor, Welsh stated that VHG "instead of trying to guess what the profit's going to be and what you're going to make, we just did a guaranteed monthly distribution."

31.     On or around March 2022, Welsh drafted a list of frequently asked questions ("March 2022 FAQs") about the Vanguard JV Cash Program, which he disseminated to Conner and others for the purpose of promoting the program. Conner then provided the March 2022 FAQs to certain promoters and prospective investors. In response to the question: "Is my money

safe?," the March 2022 FAQs stated, "Essentially yes as it's not an investment, and has a contractually guaranteed payment."

32.    Each of these statements in Paragraphs 27 through 31 was false and misleading because VHG had no sources of income to pay the monthly returns they guaranteed. As alleged above, the funds actually used to pay investors' monthly returns came from investments made by other investors, rather than any profits VHG or its affiliates generated from bond trading or related activities.

33.    The false and misleading statements regarding the guaranteed nature of the monthly returns were material because an investor would consider it important to their investment decision whether VHG could actually pay the returns it represented.

### Statements Regarding VHG's Business and Track Record

34.    Alexander and Welsh described VHG's business to prospective investors in vague and confusing terms. Their descriptions created the impression that VHG or its affiliates were engaged in the business of international bond trading and related financial activities, and that this business was so profitable that it generated outsized returns for investors.

35.    During the May 13, 2022 call with a prospective investor discussed in Paragraph 29, Alexander described VHG's business as follows:

> We have a global company. It's an SPC, segregated portfolio company, which is—in the states it would be known as a hedge fund. Oh, that's the closest thing to it in the states. But, it actually—the major difference is, hedge funds use other people's money. The SPC, we use our own money, our own collateral. And what that does is, say someone has a gold mine or a diamond mine, or you know, a really expensive painting worth say, $850 million or something like that, basically, we're housed in UBS Switzerland, in Zurich. They would take collateral possession of that and issue us a loan off of it. And we would take that loan and do exactly what we're talking about now. And that produces so much money in between that it pays that loan back off and we make a profit.

It appears that Alexander's statement about "an SPC" was a reference to TC Advantage, a VHG

affiliate for which Welsh served as CFO and director.

36.     During the same call, Alexander continued to describe the Vanguard JV Cash

Program as follows:

> This is strictly, "Hey, here's our business operation. We arrange buys and sells of
> securities, or private arrangements, people's debts, things like"—I mean company
> debts, whatever. And that's—by the way, what I didn't explain completely is, in
> the states, Vanguard, the trust, just aggregates the funds.
>
> …
>
> Now, here at Vanguard, it's aggregation. Banks see that account, or whatever
> account, like I told you, moving money into escrow, and then they release the
> paper. It goes to the other bank. The bank pays us. We pay the original bank and
> we keep everything in the middle. And that happens several times a day.
>
> . . .
>
> We're arranging. That's why I said, we arrange buys and sells. So that's what
> private bankers and secondary marketers do.
>
> . . .
>
> So, a $500 million bond, I could buy at $100 million or a $150 million or $200
> million, turn around and sell it at $300 or $400 million. And this happens three to
> five times a day every day, pretty much every day. […] Now, in the U.S., we use
> private trust to aggregate funds. The private trust, basically, the aggregation of the
> funds, for every dollar in that fund, we can get a leverage of 3x to 10x.

37.     Similarly, the March 2022 FAQs, which Welsh drafted and disseminated to

Conner and others, explained VHG's business as follows:

> Q: It seems too good to be true. How is it possible to get that percentage per
> month?
>
> A: Good question. We are a private investment bank in the secondary markets
> utilizing a private trust. One of the things that we do is buy and sell debt known as
> buy-sell arrangements. Something that is easily understandable to those that have
> a mortgage, is that the lender changes during the mortgage. This is because these
> notes are sold at a profit. Buy-Sell agreements for debt instruments such as a
> newly issued $500 Million bond may sell at 20 cents on the dollar ($200M) and
> selling it for $300M as an example. As you can see, 3, 4, or even 6% per month is

not a lot, but just seems like a lot based on what's available for those under $100 Million.

38.    In May 2022, Welsh drafted an updated version of the March 2022 FAQs ("May 2022 FAQs"). Conner then provided the May 2022 FAQs to certain promoters and prospective investors. The May 2022 FAQs were substantially similar to the March 2022 FAQs.

39.    Further, according to the March 2022 FAQs, VHG's extraordinary returns were no fluke. In response to the question: "Do you have a track record of success?," the March 2022 FAQs stated:

> Yes. The program is a little over a year old but the platform has over 17 years of success, although this program is new, the program is highly successful with a 100% track record.

40.    Like Alexander, Welsh presented VHG to prospective investors as a highly successful enterprise with deep relationships in international finance.

41.    During the September 22, 2022 Zoom call discussed in Paragraph 30, Welsh told Benchmark investors, presumably referring to TC Advantage, that "one of the companies we have is—it actually is a company that creates securities that acts like a corporate bond." Welsh continued:

> [B]ut that thing in particular is we do what are called 'buy, sell arrangements.' So we have—like he mentioned, we have a trade desk. So most people are familiar with trade desk. It's like Wall Street. That's not the same thing. We deal with secondary market. So we actually create capital, and we create products. . . . We deal in like those—the types of notes that you would see out there that—you know, corporate bonds, for instance.

Welsh also provided an example of how VHG profited from this activity, "So when you have a $500 million bond and you pick it up at 200 million, and it sells for 75 to 100 million, and this is constantly going on, that's—there's a lot of profit in that."

42.     During the same Zoom call, Welsh asserted, likely referring again to TC
Advantage, that: "One of the companies we have . . . is approved through DTC. And you don't
get approved unless you have a tremendous amount of assets. And so team and—has quite a few
Bs [billions] and assets below ground, above ground, and DTC approved us as a company."
Welsh's reference to DTC referred to The Depository Trust Company, a central securities
depository that acts as a clearinghouse and settlement system for securities.

43.     On or around January 4, 2023, Welsh spoke at a meeting in Frisco, Texas,
organized for the purpose of training promoters of the Vanguard and Benchmark JV Cash
Programs (some of whom were also investors in these programs) on how to solicit investors for
these programs. At this meeting, Welsh told the audience the following about VHG:

> You have to know that you've got, like, you have access to—we're at what's
> called the tier one. I'll give you an example: how many lenders are out there today
> that actually operate in the capacity of being able to create a security on their
> own? [. . .] None. How many of them have a trade desk? Institutions. Nobody
> had—not one entity out there today has everything integrated, but we have more
> capacity than Goldman. Do you understand what I'm saying? […] You're
> working with the entity that has more capacity than Goldman. Don't be—don't
> be—you're talking to a billionaire, don't care, right.

44.     At the same meeting, Welsh continued to tout TC Advantage's assets and
purported "approval" by the DTC. He repeated the claim that "[o]ur company"—likely a
reference to TC Advantage—"is approved with DTC." Welsh went on:

> What does that mean? How do you get approved? You have to either have a lot of
> assets and good experience [. . .] Not many companies are approved. Notes are
> approved, but when a company is approved, there's a reason—there's a couple of
> reasons that a company will be approved as a company that can create securities
> and issue securities, and that company has to have a lot of assets. Our assets in
> total probably exceed over $40 billion at this point below ground and above
> ground, okay?

45.     Each of these statements in Paragraphs 34 through 44 was false and misleading
because VHG had no legitimate business related to bond trading and did not engage in the

financial activities it represented to investors. Moreover, to the extent Alexander or Welsh were

referring to TC Advantage in any of their statements, that entity had no assets—and certainly not

billions of dollars of assets as Welsh asserted—and its corporate bond offerings never raised any

funds. Further, neither TC Advantage nor any other VHG affiliate was ever "approved" by the

DTC, because the DTC does not approve companies.

46.     These false and misleading statements regarding VHG's business and track record

were material because an investor would consider it important to their investment decision

whether VHG was actually engaged in the business it represented and possessed the track record

it represented.

### *Statements Regarding the Use of Investor Funds*

47.     During the May 13, 2022 call with a prospective investor, Alexander stated the

following about VHG's use of investor funds:

> That's what the money is doing. So, it's going to—it's live. You transfer—when
> you wire it, it's a—it's hard. It's locked for 12 months, and you get those monthly
> payments. It's leveraged, as in every dollar that's there, depending on what bank
> we're working with for that particular buy-sell arrangement, will give us a
> different amount of credit for it.

48.     And, during the December 13, 2021 call with a prospective investor, Alexander

told the investor that the Vanguard JV Cash Program is a type of investment program that

"doesn't exist in the retail world. We created it. Because you know, technically, the smaller

amounts can't help us. But they do help us because of leverage, you know." Alexander went on

to explain that these "smaller" amounts contributed by retail investors in the Vanguard JV Cash

Program represent "more dollars on leverage. So that's why we agreed to do this. [. . .] If I can

help a family, you know. . . ."

49.     Alexander explicitly distinguished the Loan Scheme from the Vanguard JV Cash

Program. In the May 13, 2022 call with a prospective VHG investor, Alexander told the investor

that "we issue lines of credit to companies, but that's not this program. That's a whole different entity, a whole different program. . . ." Alexander explained that through the Loan Scheme VHG provided loans, "but that's from our profits" and that it had "nothing to do" with the Vanguard JV Cash Program.

50.     Each of these statements in Paragraphs 47 through 49 was false and misleading because VHG did not "leverage" investor funds or otherwise use investor funds to generate profits through bond trading activities. Instead, as alleged above, VHG used investor fund to, among other things, fund unrelated ventures, make Ponzi payments, pay commissions to promoters (and Welsh), and fund Alexander's personal expenses. And contrary to Alexander's representations, VHG used Vanguard JV Cash Program investor funds to prop up the Loan Scheme, including by paying settlements to Loan Scheme victims.

51.     These false and misleading statements regarding VHG's use of investor funds were material because an investor would consider it important to their investment decision how VHG actually used their investment principal.

### Statements Regarding the Purported Protection Offered by the Pay Orders and the Fiduciary

52.     During the May 13, 2022 call with a prospective investor, Alexander claimed the Vanguard JV Cash Program was completely secure from risk of loss.  As he explained:

> In our world, everything is secure. We have insurance backed bonds. [. . .] We wanted to figure out, you know, "How do we make sure that the clients, the members, the JV members, their principal is secured." So, in other words, your principal can never go backwards. You can never lose money, only the cost of the instrument, which we figured out to use—it's called a pay order—and that's five percent. That would be your loss, if any, all right, that cost. And you can look at that as insurance. So, the pay order represents the principal amount that you put in, and it's not backed by myself, our company, the trust, or any of that. It's backed by the actual banks, meaning, if we go away and completely cease to exist, you have an instrument in your hands that the bank has to honor.

53.     During the same call, Alexander went on to explain that the pay orders were

backed by millions of dollars that VHG had deposited in the banks issuing the pay orders:

> The banks don't want you to move your liquidity. They don't want me to take
> $100 million and go buy a bunch of cashier's checks, or go take $100 million for
> the insurance company so the insurance company will back us. So, they say,
> "Hey, we already know you're good for it. It's here. We have it in our possession.
> Give us a fee," in this case it's five percent, "and we'll give you a promissory
> from us," the bank, "for this amount. Who do you want to be the beneficiary?"
> We make you guys the beneficiary. So, you see, if we don't perform, the bank is
> not worried about paying out that pay order because they're just going to take it
> out of the money that's already sitting there. And they will never let us draw over
> the amount that we have out in pay orders. That's what that five percent fee takes
> care of, the management, and the write-up, and all that stuff that they do.

54.     During the December 13, 2021 call with a prospective investor discussed in

Paragraphs 28 and 48, Alexander made similar claims about the pay orders:

> That pay order is a live instrument. It's like a cashier's check or a money order.
> It's sitting in escrow because if I send it directly to you, you literally can go cash
> it and there's nothing I can do about it.

55.     Welsh also made unqualified statements about the safety and security of the

Vanguard JV Cash Program. During the September 2022 Zoom call with existing and

prospective Benchmark investors, Welsh stated: "The stuff that we do, because it's backed by

assets, we don't have to worry about, you know, losing money or having to be in a situation. The

only thing—here's the thing because we deal a lot on the international stuff, sometimes you

might get a delay in your payment. Might be a week."

56.     At the January 4, 2023 Frisco, Texas, event for promoters discussed in Paragraph

43, Welsh again claimed that short delays with payouts were the only risks associated with

investing in VHG:

> I said, look, I'm going to tell you right now, based off what we do, do you think
> there's risk of your $500,000? Not really. Where the risk will come in is that there
> might be a delay, which we've experienced in the past, and they all get made up,
> and you know, we—we don't see—it's not enough—like, the money itself,

because we're in the institutional world, and the money is this way, and because of what we make, it's not really—your money is not really at risk.

57.    Welsh also emphasized the purported protection offered by the pay orders. During the September 2022 Zoom call with existing and prospective Benchmark investors, Welsh explained the pay orders, stating that they were similar to a "cashier's check" but issued by an "international institution like BBVA Spain, for instance." Welsh stated: "[I]f anything, you know, this or this happened, and, you know, you could execute, right, with the escrow agent and you literally would be able to get that instrument. That's literally—it's for peace of mind."

58.    The March 2022 FAQs also contained false and misleading statements about the pay orders. In response to the question: "Is there any additional assurance that will guarantee my money is safe?," the March 2022 FAQs stated as follows: "Yes. There is the option of securing a Payment Order (similar to a Cashiers [sic] Check) held with an Escrow Attorney that would be liquidated to receive the principal contribution if the JV is not making payments. An Escrow Agreement with the attorney would be done." The May 2022 FAQs contained a substantially similar representation.

59.    Welsh also drafted a "Payment Order Overview" document, which was provided to Conner, who disseminated it to prospective investors. This document stated that the pay order "eliminates the risk for the Client" and "provides immediate liquidity upon release eliminating the need for litigation."

60.    Welsh also touted the Fiduciary as an additional layer of protection for investors. At the January 4, 2023 Frisco, Texas, event for promoters, discussed in Paragraphs 43 and 56, Welsh stated:

Also too is, have you ever heard of a fiduciary? Okay. Well, what's a fiduciary? I don't know. Fiduciary. Aren't they responsible to make sure that people—well, there is a hired in fiduciary to protect the people. Why would there be a fiduciary? Bernie [Madoff] never had a fiduciary.

61.     Each of these statements in Paragraphs 52 through 60 was false and misleading because Alexander and Welsh were operating VHG as a Ponzi scheme. Investors' money was not safe, as VHG's ability to make monthly payments or to return principal to investors was dependent on Alexander and Welsh continuously attracting new capital to the scheme. These statements were also false and misleading because, on information and belief, the pay orders offered no protection against risk of loss. Bank records reflecting transactions in accounts belonging to VHG, Benchmark, and the Fiduciary do not indicate any transactions with any of the European banks that purportedly issued the pay orders. Moreover, in early 2023, a Loan Scheme victim attempted to liquidate a pay order issued to it as part of that scheme. The purported issuing bank refused payment. And the Fiduciary, who owed a contractual duty to investors to liquidate the pay orders and distribute the proceeds, never attempted to do so. Finally, Welsh's statement regarding the protection offered by the Fiduciary was misleading, as the Fiduciary was owned and controlled by a longtime associate of Alexander and Welsh, and this associate acted at Alexander and Welsh's direction at all relevant times.

62.     These false and misleading statements regarding the protection purportedly offered by the pay orders and the Fiduciary, as well as the safety and security of investing with VHG, were material because an investor would consider it important to their investment decision to understand the actual risk of loss of their investment principal and the actual mechanisms in place to protect the principal.

63.     Because Alexander and Welsh controlled VHG's and TC Advantage's operations and accounts, they knew that the story they told investors regarding the Vanguard JV Cash Program was a lie and that, in reality, it was nothing more than a Ponzi scheme. Accordingly, from the inception of the Vanguard JV Cash Program, Alexander and Welsh knew that their statements to investors and prospective investors regarding: (1) VHG's guaranteed returns; (2)

18

VHG's business and track record; (3) VHG's use of investor funds; and (4) the pay orders were complete fabrications. Additionally, Alexander and Welsh knew, at all times, that the Fiduciary was not an added, independent layer of investor protection, but rather was controlled by their longtime associate who simply followed their orders.

### Conner Launched the Benchmark JV Cash Program

64.    Following the creation of the Vanguard JV Cash Program, Alexander and Welsh continued to operate the Loan Scheme, thereby increasing the amount of capital that VHG needed to generate to meet the mounting funding obligations to new borrowers. Throughout 2022, VHG affiliates failed to fund their lines of credit obligations. Some Loan Scheme victims terminated their loan agreements and demanded the return of their upfront fees. To stave off victims' demands to return substantial upfront fees, Alexander and Welsh convinced other victims not to terminate by offering smaller payments. When Loan Scheme victims demanded the return of their upfront fees, Alexander and Welsh delayed as long as possible, and some victims eventually filed lawsuits. Alexander used VHG investor funds (and later Benchmark investor funds as well) to settle lawsuits with, and make interim payments to, Loan Scheme victims.

65.    By early 2022, VHG desperately needed new investor funds. In February 2022 alone, VHG raised approximately $8.1 million in Vanguard JV Cash Program investments, which was more than it had raised in total since Alexander and Welsh launched the scheme in May 2021. Since Alexander and Welsh did not actually use investor funds to engage in trading to generate profits, this rapid growth dictated that VHG would need to continue raising large sums of new investor money to keep up with its mounting obligations to pay the guaranteed monthly returns to its prior investors. Compounding its cash flow issues, in January 2022, VHG (directly and through Axiom) was forced to pay over $6 million to Loan Scheme victims. In addition to

VHG's immediate need for cash to pay both VHG investors and Loan Scheme victims, VHG needed even more cash to meet its looming obligation to return the principal investments to early VHG investors whose 14-month investment terms began to expire in July 2022.

66.     By March 2022, Conner had invested $75,000 of his own money in the Vanguard JV Cash Program and was also recruiting new VHG investors, for which VHG paid Conner a 1.5% to 6% commission for each investment he obtained. In late March 2022, Welsh provided the March 2022 FAQs to Conner, which Conner began emailing to prospective investors. Conner formed Benchmark in May 2022, and he created the Benchmark JV Cash Program around July 2022.

67.     Benchmark's relationship with VHG was documented in a July 2022 master joint venture agreement ("Master JV Agreement") signed by Conner on behalf of Benchmark and by Alexander on behalf of VHG. The Benchmark JV Cash Program mirrored VHG's program. It was structured to solicit funds from investors, pool those funds, and then transfer the funds to VHG in return for guaranteed monthly payments to Benchmark. In turn, Benchmark would use the payments from VHG to pay guaranteed monthly returns to its own investors.

68.     The terms of the Master JV Agreement were beneficial for both parties. For VHG, the agreement incentivized Conner to raise—and transfer to VHG—as much new investor money as possible, thereby helping to alleviate VHG's cash flow problems. And Conner, through Benchmark, stood to earn far more than he would have received as either a VHG investor or promoter. Under VHG's standard joint venture agreement with VHG investors, VHG investors could invest additional funds, and thereby increase the amount of their guaranteed monthly returns, but only within the first six months of their 14-month term. But the Master JV Agreement allowed Benchmark to transfer additional funds to VHG *at any time* during the 14-month term. Additionally, under VHG's standard joint venture agreement, an investor's monthly

return rate was fixed to the rate that the investor's initial investment amount qualified it to receive, even if, after investing additional funds, the total investment amount would have qualified the investor for a higher rate. The Master JV Agreement did not similarly fix Benchmark's monthly return rate; Benchmark could subsequently receive a higher rate at any time by transferring additional funds to VHG. Finally, VHG's standard joint venture agreement promised VHG investors monthly returns of up to 6%, whereas the Master JV Agreement allowed Benchmark to receive *as much as 20% per month*, as set forth below:

| Guaranteed Monthly Return | Amount of Funds Sent by Benchmark to VHG |
|---|---|
| 3% | $30,000 - $999,999 |
| 4% | $1 million - $4.99 million |
| 6% | $5 million - $9.99 million |
| 9% | $10 million - $24.9 million |
| 12% | $25 million - $49.9 million |
| 20% | $50 million + |

69.     Assuming Benchmark transferred at least $10 million to VHG, thereby qualifying Benchmark to receive a 9% monthly return, the Master JV Agreement allowed Benchmark to earn a spread between the monthly returns it received from VHG and those that Benchmark promised to pay its own investors. For Conner, this arrangement was far more lucrative than the commissions of 1.5% to 6% that VHG had been paying him over 12 months for recruiting new VHG investors.

70.     In turn, Benchmark offered its investors higher returns than VHG offered its own investors. For example, Benchmark offered its investors returns ranging between 2.5% and 12% (average return of 5.8%), whereas VHG offered its investors returns between 3% and 6% (average return of 4%). By offering higher returns than VHG, the Benchmark JV Cash Program grew quickly. Like VHG, Benchmark also paid commissions to promoters who referred investors to its program. The Benchmark joint venture agreements disclosed that investors would be

charged a 3% to 4% "set-up fee" and, if they elected, a 5% pay order fee. Neither Benchmark nor Conner disclosed any additional fees or other charges related to the Benchmark JV Cash Program.

71.    The Benchmark JV Cash Program not only served to generate funds that allowed Alexander and Welsh to make Ponzi payments to pay the guaranteed monthly returns to VHG investors, but it also enabled them to avoid VHG's obligations to return its investors' principal when their 14-month terms ended. Between December 2022 and February 2023, Alexander and Welsh gave VHG investors the option to "roll over" their principal investments from the Vanguard JV Cash Program to the Benchmark JV Cash Program rather than receive their principal back after 14 months. Though VHG never actually transferred the VHG investor funds to Benchmark, Conner understood that VHG would credit Benchmark for the "roll overs" when calculating Benchmark's monthly return. In total, VHG investors "rolled over" approximately $5.5 million in principal investments to Benchmark.

72.    Conner marketed his Benchmark JV Cash Program much like Alexander and Welsh marketed their Vanguard JV Cash Program. As discussed in Paragraph 73, Conner often sent prospective investors, via email and text message, the March 2022 FAQs, the May 2022 FAQs, and a slide deck that described the pay orders. Conner received these documents from Welsh, who drafted them and, as alleged above, they contained many of the same false statements that Alexander and Welsh made to prospective VHG investors, including that: (1) the investment was highly successful with a 100% track record; (2) investors could eliminate any risk of loss by purchasing pay orders backed by assets; (3) monthly returns were guaranteed; and (4) the returns were generated by international bond trading.

73.    Examples of Conner sending these documents to existing and prospective investors include:

- On April 6, 2022, Conner emailed the March 2022 FAQs and the pay order slide deck to a prospective investor. Three months later, that individual invested $100,000 in the Benchmark JV Cash Program.

- On April 20, 2022, Conner emailed the March 2022 FAQs to a prospective investor who subsequently invested $856,000 in the Benchmark JV Cash Program through a trust.

- On April 22, 2022, Conner emailed the March 2022 FAQs and the pay order slide deck to a prospective investor who, on July 8, 2022, forwarded them to another individual. On August 30, 2022, the person who received the forwarded documents invested $30,000 in the Benchmark JV Cash Program through a trust.

- On August 23, 2022, Conner texted the May 2022 FAQs to two existing VHG and Benchmark investors, one of whom invested, through his business, an additional $224,724 in the Benchmark JV Cash Program. Moreover, these two individuals recruited at least eight others to invest approximately $1 million in the Benchmark JV Cash Program.

- On August 24, 2022, Conner emailed the May 2022 FAQs and the pay order slide deck to a prospective investor who invested $200,000 in the Benchmark JV Cash Program and paid a $10,000 pay order fee.

- On August 24, 2022, Conner emailed the pay order slide deck to a prospective investor who invested $277,800 in the Benchmark JV Cash Program and paid a $13,890 pay order fee.

- On August 28, 2022, Conner texted the pay order slide deck to a prospective investor. That individual and his wife invested $120,000 in the Benchmark JV Cash Program and paid a $6,000 pay order fee.

- On September 5, 2022, Conner texted a prospective investor regarding emailing the May 2022 FAQs to the prospective investor. Three days later, that individual invested $800,000 in the Benchmark JV Cash Program through a trust.

- On September 7, 2022, Conner emailed the May 2022 FAQs and pay order slide deck to a prospective investor. Two months later, that individual invested $100,000 in the Benchmark JV Cash Program and paid a $5,000 pay order fee.

74.    Additionally, Conner frequently sent prospective investors, via email and text messages, a Dropbox link to a recording of Alexander's May 13, 2022 telephone call with a prospective VHG investor (discussed in Paragraphs 29, 35, 47, 49, and 52). During that call, as alleged above, Alexander repeated many of the same, or substantially similar, false claims contained in the FAQs and the pay order slide deck. Examples of Conner sending links to the recording of the May 13, 2022 call to existing and prospective investors include:

- On June 30, 2022, Conner emailed a Dropbox link of the recording to a prospective investor. Less than two weeks later, that individual invested $500,000 in the Benchmark JV Cash Program through a trust.

- On July 20, 2022. Conner texted a Dropbox link of the recording to a prospective investor. On August 9, 2022, that individual invested $30,000 in the Benchmark JV Cash Program through a trust. Subsequently, he invested an additional $300,000 and recruited at least 50 others to invest approximately $10.2 million in the Benchmark JV Cash Program.

- On August 5, 2022, Conner texted a Dropbox link of the recording to a prospective investor. That individual invested $347,222.22 in the Benchmark JV Cash Program through a trust, and he recruited at least nine others to invest approximately $1.83 million in the Benchmark JV Cash Program.

- On August 13, 2022, Conner texted a Dropbox link of the recording to a prospective investor who invested $175,000 in the Benchmark JV Cash Program through a trust.

- On December 5, 2022, Conner texted a Dropbox link of the recording to an existing Benchmark investor. That individual invested an additional $130,000 through his business, and he recruited others to invest approximately $4.3 million in the Benchmark JV Cash Program.

75.     Conner also sent the recording to promoters to help them sell the Benchmark JV Cash Program to prospective investors. For example, on January 20, 2023, Conner texted a Dropbox link of the recording to an individual who, at Conner's direction, promoted the Benchmark JV Cash Program to prospective investors, and also communicated with existing investors to assure them of Benchmark's safety and legitimacy. Before receiving the link to the recorded call, the promoter had obtained only a single $100,000 investment in the Benchmark JV Cash Program. However, during the two months after receiving the link from Conner, the promoter secured 19 more investments totaling approximately $2.7 million. Similarly, in the month after Conner sent the recording to a Benchmark investor and promoter on July 20, 2022 (as discussed in Paragraph 74), the promoter successfully recruited 23 investors who invested approximately $3.5 million.

76.     From the outset of the Benchmark JV Cash Program, which Conner presented as an opportunity to participate in VHG's international trading business, Conner held back investor

funds that he was obligated to transfer to VHG. In total, Conner transferred approximately $46 million of investor funds to VHG, failing to send VHG approximately $8.8 million (or 16%) of the $54.9 million in investor funds received by Benchmark. The amount of Benchmark investor funds that Conner held back far exceeded the 3% to 4% "set-up fee" that Conner disclosed to investors. Of this held-back amount, Conner transferred approximately $7.2 million to his affiliated trust for his personal use, including for the purchase of a $5 million home around February 2023. Conner continued to misappropriate held-back Benchmark investor funds even after Benchmark largely stopped paying its investors in March 2023.

77.    By the end of 2022, Conner knew, or was severely reckless in not knowing, multiple facts indicating the fraudulent nature of the Vanguard JV Cash Program and, by extension, Benchmark's own investment program. First, Conner knew that he was defrauding investors by failing to send millions of dollars of Benchmark investor funds to VHG—the overwhelming majority of which he personally misappropriated. Moreover, after Conner stopped sending any Benchmark investor funds to VHG in mid-February 2023, Benchmark received approximately $112,000 from 14 investors for their pay order fees. Conner never sent these funds to VHG to obtain pay orders for the investors.

78.    Second, throughout 2022, the Fiduciary's managing member texted and emailed Conner that some prospective investors had been advised (including by at least one attorney and one accountant) that the Benchmark JV Cash Program was likely a Ponzi scheme. Because Conner was a VHG investor, he knew that the Benchmark JV Cash Program mirrored the Vanguard JV Cash Program.

79.    Third, by October 2022, an administrative assistant who helped administer the Benchmark JV Program had told Conner that, despite multiple requests, Alexander had not sent to the Fiduciary proof that multiple pay orders that Benchmark investors had purchased had been

obtained. Conner relied on Alexander to obtain pay orders for Benchmark investors and, prior to October 2022, his administrative assistant received purported evidence from Alexander that the pay orders had been obtained.

80.     Fourth, starting around October 2022, multiple banks where VHG and Benchmark had accounts began holding or rejecting wire transactions to or from VHG, Benchmark, and other affiliated trusts and entities. By January 2023, Conner knew that VHG's bank had frozen its account, which prevented VHG from paying any returns to Benchmark that month. Nevertheless, in January 2023, Conner paid Benchmark investors approximately $2.2 million in purported returns, using commingled funds that Benchmark had received from VHG and from newer Benchmark investors. On January 6, 2023, Benchmark's bank notified Conner that it was closing Benchmark's account.

81.     Fifth, in February 2023, Alexander and Welsh told Conner that, beginning the following month, any additional investor funds that Conner and Benchmark transferred to VHG could not be used to increase Benchmark's guaranteed monthly return rate pursuant to the terms of the Master JV Agreement. At that time, Benchmark was eligible for the 12% monthly return tier, and it was close to the $50 million threshold that would move Benchmark to the 20% tier. But Alexander and Welsh's edict prevented Benchmark from reaching the 20% tier. This change made it nearly impossible for Conner to pay Benchmark's investors their guaranteed monthly distributions.

82.     Sixth, Conner knew that the Master JV Agreement offered Benchmark far more lucrative terms than those offered to other VHG investors or promoters. Conner knew this because he was originally a VHG investor and promoter. And, although VHG promised to pay Benchmark monthly guaranteed returns as high as 20%, VHG's purported business model remained unchanged.

27

**Alexander, Welsh, and Conner Attempted to Keep the Ponzi Scheme from Collapsing**

83.    VHG's cash flow problems continued into 2023, and it had looming financial obligations to both its investors and its Loan Scheme victims that it could not meet. Beginning around February 2023, Alexander and Welsh, with Conner's participation, took various actions to prolong their fraudulent scheme.

84.    First, Alexander, Welsh, and Conner attempted to stretch VHG's limited cash by paying monthly returns only to select investors. In February 2023, Alexander told the Fiduciary that VHG had insufficient cash to pay the promised monthly returns to all VHG investors and to Benchmark, as the funds were purportedly tied up in bonds. Alexander instructed the Fiduciary to prepare a list of investors that VHG termed "priority" investors. Benchmark was not deemed a priority investor and did not receive funds from VHG after February 2023. The Fiduciary paid the priority investors, using funds provided by Alexander, Welsh, and Conner (or their respective affiliated trusts).

85.    Next, from February 2023 to at least January 2024, Welsh, with input from Alexander, drafted multiple false and misleading email updates, promising VHG investors that they would soon receive the payment of their past due monthly returns and their principal. Welsh directed the Fiduciary to email these updates to VHG investors and to Benchmark. In turn, Conner directed an administrative assistant and others to distribute these updates to Benchmark investors, often under the guise of communications originating from Benchmark rather than from VHG. In these communications, Alexander and Welsh claimed that VHG was completing a bond liquidation process, the proceeds of which would fund outstanding payments. In addition to containing false promises that the past due monthly payments would soon resume, Alexander and Welsh's communications to investors were rife with patently false excuses for the payment delays, variously blaming VHG's banks, technological glitches, attorney review, and bond sale

28

delays. However, Alexander and Welsh never told investors the truth: VHG did not have enough money to pay them because the Ponzi scheme was collapsing.

86.    From February 2023 to at least January 2024, Alexander, Welsh, and Conner continued to solicit new investments and to encourage existing investors to roll over their principal to new 14-month terms, rather than withdraw their funds as their investment terms expired. But except for the priority investors, no VHG or Benchmark investors received their past due guaranteed monthly payments or the promised return of their principal. By the time the scheme collapsed by early 2024, VHG and Benchmark had raised at least $91 million from more than 200 investors. VHG and Benchmark investors collectively suffered losses in the tens of millions of dollars.

**The Vanguard and Benchmark JV Cash Programs were Unregistered Securities Offerings**

87.    The Vanguard JV Cash Program was a securities offering because investments in it constituted investment contracts under the federal securities laws. VHG investors invested money by wiring funds to VHG's bank accounts, where the money was pooled with other investors' funds. After sending their money to VHG, the investors had no decision-making authority regarding how VHG would use their funds and they had no control over the success of their investments. Instead, the investors collectively relied on the efforts and expertise of VHG and its affiliated entities, including TC Advantage, to generate sufficient revenues to pay their guaranteed monthly payments and to return their capital to them at the end of their investment terms.

88.    Although VHG investors were nominally labeled joint venturers, they nevertheless expected their profits solely from the efforts of VHG and its affiliated entities. Notwithstanding the joint venture terminology, the investors were entirely passive and received form documents without the ability to negotiate their terms. The joint venture agreements

provided VHG investors no voting rights and no power to direct how VHG used their money. Moreover, in practice, investors had no control over, or insight into, what was done with their money after they sent it to VHG. The investors had to rely on VHG for the success or profitability of the purported joint venture because they were inexperienced in the international bond trading and other financial activity that VHG claimed it engaged in to generate its revenues. VHG investors were not given any information or access that would have allowed them to participate in, or even view, the alleged trading or any other financial activity.

89.    The Benchmark JV Cash Program was also a securities offering because investments in it constituted investment contracts under the federal securities laws for the same reasons as the Vanguard JV Cash Program. Benchmark investors invested money by wiring funds to Benchmark's bank accounts or, occasionally, directly to VHG's bank accounts, where the money was pooled with other investors' funds. Like VHG investors, Benchmark investors collectively relied on the efforts and expertise of VHG and its affiliated entities to generate profits for them through the same purported international bond trading and related financial activities. Benchmark investors also had no control over the use of their money after sending their funds to Benchmark or VHG. Additionally, the Benchmark joint venture agreements were nearly identical to the VHG joint venture agreements, and Benchmark investors were solely dependent on VHG's efforts for the same reasons as were VHG investors.

90.    Alexander and Welsh, together, personally offered and sold Vanguard JV Cash Program investments by general solicitation to at least 33 investors in multiple states. Alexander and Welsh used in-person events, email, and telephone and Zoom calls to solicit investors, many of whom did not have preexisting, substantive relationships with either Alexander or Welsh. Additionally, Welsh trained promoters (many of whom were investors) on how to market the Benchmark JV Cash Program to prospective investors.

91.     Conner personally offered and sold Benchmark JV Cash Program investments by general solicitation to at least 50 investors in multiple states, many of whom did not have a preexisting, substantive relationship with Conner. Conner communicated with prospective investors through email, telephone and Zoom calls, text messages, and in-person meetings.

92.     Neither the Vanguard JV Cash Program nor the Benchmark JV Cash Program was registered with the SEC. Alexander, Welsh, and Conner did not attempt to verify that VHG or Benchmark investors were accredited investors and, in fact, not all of them were.

## FIRST CLAIM FOR RELIEF

### Alexander and Welsh Violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

93.     The SEC realleges and incorporates by reference each and every allegation contained in the paragraphs above.

94.     By engaging in the acts and conduct alleged herein, Alexander and Welsh, directly or indirectly, in connection with the purchase or sale of a security, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

(a)     employed a device, scheme, or artifice to defraud; and/or

(b)     made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

95.     By reason of the foregoing, Alexander and Welsh violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Conner Violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rules 10b-5(a) and 10b-5(c) [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c)]

96.     The SEC realleges and incorporates by reference each and every allegation contained in the paragraphs above.

97.     By engaging in the acts and conduct alleged herein, Conner, directly or indirectly, in connection with the purchase or sale of a security, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

      (a)    employed a device, scheme, or artifice to defraud; and/or

      (b)    engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

98.     By reason of the foregoing, Conner violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rules 10b-5(a) and 10b-5(c) [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c)].

## THIRD CLAIM FOR RELIEF

### Alexander, Welsh, and Conner Violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

99.     The SEC realleges and incorporates by reference each and every allegation contained in the paragraphs above.

100.     By engaging in the acts and conduct alleged herein, Alexander, Welsh, and Conner, directly or indirectly, in the offer or sale of securities, by the use of any means or

instruments of transportation or communication in interstate commerce or by use of the mails, have:

(a)      knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

(b)      knowingly, with severe recklessness, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)      knowingly, with severe recklessness, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

101.    By reason of the foregoing, Alexander, Welsh, and Conner violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## **FOURTH CLAIM FOR RELIEF**

### **Alexander, Welsh, and Conner Violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]**

102.    The SEC realleges and incorporates by reference each and every allegation contained in the paragraphs above.

103.    By engaging in the acts and conduct alleged herein, Alexander, Welsh, and Conner, directly or indirectly:

(a)      made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium

33

of any prospectus or otherwise, securities as to which no registration

statement was in effect;

(b)    for the purpose of sale or delivery after sale, carried or caused to be

carried through the mails or interstate commerce, by means or instruments

of transportation, securities as to which no registration statement was in

effect; and/or

(c)    made use of means or instruments of transportation or communication in

interstate commerce or of the mails to offer to sell, through the use or

medium of any prospectus or otherwise, securities as to which no

registration statement had been filed.

104.    There were no applicable exemptions from registration.

105.    By reason of the foregoing, Alexander, Welsh, and Conner violated, and unless

enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C.

§§ 77e(a), 77e(c)].

## FIFTH CLAIM FOR RELIEF

### Conner Aided and Abetted Alexander's and Welsh's Violations of Section 10(b)
### of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5
### [17 C.F.R. §§ 240.10b-5]

106.    The SEC realleges and incorporates by reference each and every allegation

contained in the paragraphs above.

107.    By engaging in the acts and conduct alleged herein, Conner aided and abetted

Alexander's and Welsh's violations of Section 10(b) of the Exchange Act and Rule 10b-5

thereunder by knowingly or recklessly providing substantial assistance to Alexander and Welsh

who, directly or indirectly, in connection with the purchase or sale of a security, by the use of

any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

    (a)    employed a device, scheme, or artifice to defraud; and/or

    (b)    made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

    (c)    engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

108.    By reason of the foregoing, Conner aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

### SIXTH CLAIM FOR RELIEF

### Conner Aided and Abetted Alexander's and Welsh's Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

109.    The SEC realleges and incorporates by reference each and every allegation contained in the paragraphs above.

110.    By engaging in the acts and conduct alleged herein, Conner aided and abetted Alexander's and Welsh's violations of Section 17(a) of the Securities Act by knowingly or recklessly providing substantial assistance to Alexander and Welsh who, directly or indirectly, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

    (a)    knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

      (b)      knowingly, with severe recklessness, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      (c)      knowingly, with severe recklessness, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

111.    By reason of the foregoing, Conner aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## JURY DEMAND

112.    The SEC demands a trial by jury.

## PRAYER FOR RELIEF

THEREFORE, the SEC respectfully requests that the Court enter a Final Judgment that:

A.    Permanently enjoins Defendants Alexander, Welsh, and Conner from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

B.    Permanently enjoins Defendants Alexander, Welsh, and Conner from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

C.    Permanently enjoins Defendants Alexander, Welsh, and Conner from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)];

D.    Permanently enjoins Defendants Alexander, Welsh, and Conner from directly or indirectly, including, but not limited to, through any entity they own or control, participating in

the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent them from purchasing or selling securities for their own personal accounts;

   E. Orders Defendants Alexander, Welsh, and Conner to disgorge all ill-gotten gains received as a result of the violations alleged herein, plus prejudgment interest on those amounts, pursuant to the Court's equitable powers and Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), 78u(d)(7)];

   F. Orders Defendants Alexander, Welsh, and Conner to pay civil penalties under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

   G. Grants such further relief as the Court deems just and proper.

Date: April 29, 2025     Respectfully submitted,

        /s/ *Jason J. Rose*
        JASON J. ROSE
        Texas Bar No. 24007946
        SECURITIES AND EXCHANGE
        COMMISSION
        Burnett Plaza, Suite 1900
        801 Cherry Street, Unit 18
        Fort Worth, Texas 76102
        (817) 978-1408 (jjr)
        (817) 978-4927 (facsimile)
        rosej@sec.gov

        ATTORNEY FOR PLAINTIFF
        SECURITIES AND EXCHANGE
        COMMISSION